UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOME BUILDERS ASSOCIATION OF GREATER CHICAGO, and HOYNE DEVELOPMENT LLC<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF CHICAGO, a municipal corporation,<br><br>Defendant. | No. 15 C 8268<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiff Hoyne Development LLC ("Hoyne") is a real estate developer. In 2012, Hoyne purchased commercial property in Chicago's 47th ward, intending to seek re-zoning and develop the property for residential use. Hoyne succeeded in getting the property re-zoned, but as a condition of obtaining building permits, the City of Chicago demanded that Hoyne comply with its Affordable Requirements Ordinance ("ARO"), a measure to increase the availability of affordable housing in Chicago. Specifically, the City required Hoyne to set aside two housing units for rent or sale to low-income residents, or pay a $200,000 fee. Hoyne complied by paying the fee. It then filed this action in state court, alleging that the ARO constitutes a taking in violation of the U.S. and Illinois Constitutions, both facially and as applied to Hoyne. Hoyne also alleged a state law claim that the City exceeded its authority under the ARO in its application of the ordinance to Hoyne. Plaintiff Home Builders Association of Greater Chicago ("HBAGC"), a real estate trade association, joined Hoyne in the facial challenge to the ordinance. The City of Chicago removed the case to this court and moves to dismiss for failure to state a claim. For the reasons set forth here, the court grants the motion and dismisses Plaintiffs' complaint without prejudice.

## FACTS

In May 2012, Hoyne Development signed a contract to buy two contiguous parcels at the corner of Irving Park and Hoyne in Chicago. (Compl. ¶ 11.) At the time of purchase, these properties were zoned as commercial properties.[1] (Compl. ¶ 12–13.) Hoyne intended to develop the properties as three buildings: two six-unit condo buildings, and one building with two apartments and retail space. (Compl. ¶ 14.) Hoyne applied for a zoning change that would allow for significantly greater density in the project, and for a special use authorization to allow residential units on the ground floor of the two six-unit buildings. (Compl. ¶ 15.) Such a zoning change, which allows for more development options, including more permitted uses and greater density, is referred to as "up-zoning." (Def.'s Mem.in Supp. of Mot. to Dismiss ("Def.'s Mem.") at 4); (Pl.'s Resp. to Def.'s Mot. to Dismiss ("Pl.'s Resp.") at 8). The Chicago City Council approved the up-zoning and the authorization for ground floor residential units. (Compl. ¶ 17; Ex. 3 Def.'s Mem. at 44457.) Hoyne then applied to separate the properties into three separate tax parcels. (Compl. ¶ 17.) Hoyne later closed on the purchase and applied for building permits for the three buildings. (Compl. ¶ 18.)

The City "placed a hold" on the permits in April 2013, and refused to issue them unless Hoyne complied with the City's Affordable Requirements Ordinance, Chicago Municipal Code 2-45-110 ("ARO"). (Compl. ¶ 1, 19.) The ARO applies, in relevant part, to "residential housing

---

[1] The complaint alleges that "many commercial properties in the ward were zoned B2-1," but does not allege the specific zoning level of the properties in question. (Compl. ¶ 13.) In fact, zoning level B2-1 does allow residential units, including units on the ground floor. Chicago Municipal Code 17-3-0103-B. The City ordinance implementing the requested zoning change, attached to the City's motion to dismiss, indicates that the properties were originally zoned B1-1 (Ex. 3 to Def.'s Mem. in Supp. of Mot. to Dismiss, at 44457), which does not allow ground floor residential units, except by special use approval, which Hoyne alleges it applied for. (Compl. ¶ 15); Chicago Municipal Code 17-3-0102-D, -0203, -0207. Both parties agree that the parties were originally zoned for commercial uses and did not allow for Hoyne's planned development. B1-1 and B2-1 zoning designations are both intended for "small-scale retail and service uses." Chicago Municipal Code, 17-3-0102-A & -0103-A. Both B1-1 and B2-1 designations have the lowest permitted floor area ratio, and changing the zoning level to B2-2, as Hoyne successfully did, would nearly double the maximum floor area ratio, allowing for significantly greater density. (Compl. ¶ 17); Chicago Municipal Code, 17-3-0403-A.

project[s]" of ten units or more when the property has been granted a zoning change that (1) increases the allowable density of the development, or (2) permits the development of residential units that were not allowed under the prior zoning designation. Chicago Municipal Code 2-45-110. If the ARO applies to a specific project, developers must either (1) dedicate ten percent of the new units as affordable housing for rent or sale for thirty years, or (2) pay a fee of $100,000 per required unit into an affordable housing fund. *Id.* After thirty years, the units are no longer bound by the ARO restrictions. *Id.*[2]

The City characterized Hoyne's three proposed buildings as a single "residential housing project" of fourteen units. (Compl. ¶ 19.) The City's policy has been to round up to the nearest whole number for purposes of calculating the required number of affordable units. (Compl. ¶ 23 & n.3.) Consistent with that policy, the City demanded that Hoyne either provide two affordable units or pay $200,000 to comply with the ARO, and it refused to issue the building permits until Hoyne did so. (Compl. ¶ 19, 26.) Hoyne objected, asserting that the three buildings are not one project, and that even if the ARO does apply to the buildings as one project, two affordable units would exceed the ARO's ten percent requirement. (Compl. ¶ 20–21.) Hoyne nevertheless executed and recorded the City's "Affordable Rental Unit Covenant," designating two units as affordable housing, and sent the City a letter of protest. (Compl. ¶ 27–28.) On June 29, 2015, Hoyne paid $200,000 to the City. (Compl. ¶ 30.)

Hoyne and HBAGC then filed this suit. HBAGC members include other real estate developers who have also been required to comply with the terms of the ARO. (Compl. ¶ 46.) In Count I, both Plaintiffs seek a declaratory judgment that the ARO is unconstitutional on its face. (Compl. ¶ 47.) In Count II, Hoyne seeks a declaratory judgment that (1) that the ARO is

---

[2] The ARO was originally adopted in 2007. The City amended the ARO in 2015, establishing zones throughout the city with different affordable housing requirements for developments, and generally requiring developers to satisfy more of their ARO obligations through affordable housing units, rather than fees in lieu, than under the 2007 ARO. Chicago Municipal Code 2-45-115. The 2015 amendment does not apply to Hoyne's project or other projects that were subject to the original 2007 ARO before the amendment was effective. Chicago Municipal Code 2-45-110 and -115. The 2007 ARO is the only provision at issue here.

3

unconstitutional as applied to Hoyne, and (2) that the City exceeded its authority under the ARO by requiring that Hoyne dedicate two units as affordable housing. (Compl. ¶ 51.) In Count II, Hoyne also reiterates its demand for a declaratory judgment that the ARO is "not enforceable." (Compl. ¶ 52.)

## DISCUSSION

### I. Legal Standard

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain sufficient facts to state a plausible claim, that is, "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2009)). When ruling on such a motion, the court presumes all well-pleaded facts in the complaint to be true, and views them in the light most favorable to the plaintiff. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 914–15 (7th Cir. 2015). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. While a complaint does not need detailed factual allegations, mere conclusory labels or formulaic statements reciting the elements of a claim are not sufficient. *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted). This same standard applies to constitutional claims under the Takings Clause. *See Marozsan v. Speybroeck*, 165 F.3d 32 (7th Cir. 1998) (unpublished table decision) (dismissing a claim where the plaintiff did not allege "that the rights lost [were] so essential to the use or economic value of [the] property that [a] state-authorized limitation of it amounted to a taking") (second and third alterations in original) (internal citations and quotation marks omitted).

## II. Federal Law Claims

### A. The Unconstitutional Conditions Doctrine

Plaintiff Hoyne contends the ARO violates the Constitution's Takings Clause both on its face (Count I) and as applied (Count II). Both challenges invoke the "unconstitutional conditions" doctrine, as articulated in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374 (1994). Under this doctrine, "the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." *Dolan*, 512 U.S. at 385. In *Nollan*, the California Coastal Commission conditioned a permit to demolish a house and build a new one on the owners' granting an easement to allow the public to cross the property. *Nollan*, 483 U.S. at 827–28. In *Dolan*, the government demanded that the property owner grant the city a strip of land as a condition for a permit that enabled the owner to redevelop its land and expand its business. *Dolan*, 512 U.S. at 379. In both cases, the Court held that such actions would be takings if they were simply ordered by the government, and that making these actions conditions of a building permit therefore required special examination. *Dolan*, 512 U.S. at 384–86; *Nollan*, 483 U.S. at 831, 841. If the government could not have ordered the action without violating the Constitution, then imposing the condition constitutes an unconstitutional taking unless the government can show an "essential nexus" between the condition and the end the government seeks to achieve, and a "rough proportionality" between the condition and the impact of the proposed development. *Dolan*, 512 U.S. at 391; *Nollan*, 483 U.S. at 837.

*Nollan* and *Dolan* involved a dedication of property as a condition of permit approval. In *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 2586, 2599 (2013), the Court held that monetary fees in lieu of dedicating property are also subject to the *Nollan/Dolan* test. In *Koontz*, the property owner applied for a permit to develop wetlands and offered to grant an easement over part of the remaining property to the government. *Id.* at 2592–93. The

5

government demanded that the owner grant a larger easement or pay a fee. *Id.* at 2593. Reversing the Florida Supreme Court's ruling approving that condition, the Supreme Court held that a government cannot make an unconstitutional condition permissible simply by offering a fee alternative; doing so would make it "very easy for land-use permitting officials to evade the limitations of *Nollan* and *Dolan*." *Id.* at 2599. Such a fee "must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan*." *Id.* The Court did not hold, however, that all fees related to property regulation must meet the "essential nexus" and "rough proportionality" requirements, *see id.* at 2600 n.2 (declining to extend the holding to all monetary fees), and instead repeated that "[a] predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Id.* at 2598. In other words, whether the landowner is challenging the seizure of property or the imposition of a monetary fee, the landowner must show that government action constitutes a taking of a property interest under the Takings Clause in order to trigger consideration of the "essential nexus" and "rough proportionality" inquiries. *See id.* at 2598–99 (examining, as a threshold matter, whether an easement would have violated the Constitution if the government had directly seized it, rather than making it a condition of the permit).

In contrast to a seizure of property, a restriction on the use of property is not a taking that would require just compensation, unless it goes so far as to be a regulatory taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). In that case, which upheld a restriction on the development of historic landmarks, the Court explained that some regulations can be takings "when justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Cent. Transp. Co.*, 438 U.S. at 107, 124, 138 (internal citations omitted); *cf. Yee v. City of Escondido, Cal.*, 503 U.S. 519, 528–29 (1992) ("This Court has consistently affirmed that States have broad power to regulate housing conditions in

6

general . . . without paying compensation for all economic injuries that such regulation entails.") (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982)). In *Yee v. City of Escondido,* 503 U.S. 519 (1992), a regulation set maximum rents for land rented to mobile home owners. *Yee*, 503 U.S. at 524. The Supreme Court held that this regulation was a permissible use restriction, not a dedication of property to the government akin to physical occupation of the land. *Id.* at 532.

Because a permissible use restriction does not violate the Constitution, such a restriction cannot be an unconstitutional condition, and so does not even require consideration of the *Nollan/Dolan* test. *See Cal. Bldg. Indus. Assn.. v. City of San Jose*, 61 Cal. 4th 435, 460, 351 P.3d 974, 990 (2015), *cert. denied sub nom. Cal. Bldg. Indus. Assn. v. City of San Jose, Cal.*, 136 S. Ct. 928 (2016) ("Nothing in *Koontz* suggests that the unconstitutional conditions doctrine under *Nollan* and *Dolan* would apply where the government simply restricts the use of property without demanding the conveyance of some identifiable protected property interest (a dedication of property or the payment of money) as a condition of approval."). In this case, the City of Chicago contends that the ARO is not a dedication of property, but is simply a use restriction like the maximum rent ceilings in *Yee*, and therefore the unconstitutional conditions doctrine does not apply, even without considering the fees-in-lieu option. (Def.'s Mem. 10–12.)

At least in the complaint, Plaintiffs appear to have skipped one step in the analysis. Although the complaint alleges that the building permit is conditioned on complying with the ARO (Compl. ¶ 19, 33), the complaint contains no specific allegations that the ARO is the taking of a property interest without just compensation. Instead, Plaintiffs' allegations appear to assume that a requirement that units be dedicated as affordable housing implicates the Takings Clause, and then assert that the "essential nexus" or "rough proportionality" tests are not met. (Compl. ¶ 33–40.) In their memorandum in opposition to the motion to dismiss, however, Plaintiffs do argue that the ARO is both a physical invasion of Hoyne's property and a regulatory taking. (Pl.'s Resp. at 3–6, 10–12.) The court considers each of these arguments in turn.

7

B.  Hoyne's As-Applied Challenge

1.  Per Se Takings

There are "two categories of regulatory action that generally will be deemed per se takings for Fifth Amendment purposes." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005). The first occurs when "government requires an owner to suffer a permanent physical invasion of her property—however minor[.]" *Id.* (citing *Loretto*, 458 U.S. 419). The second per se taking is a regulation "that completely deprive[s] an owner of '*all* economically beneficial us[e]' of her property." *Lingle*, 544 U.S. at 538 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019) (emphasis in original).

As to the second category, Plaintiffs do not suggest that the ARO deprives Hoyne of all economically beneficial use of its land. Indeed, as the City notes, the ARO applies to Hoyne by virtue of the up-zoning that actually expanded Hoyne's options for development and permitted greater density. Def.'s Reply at 3–4.) Nor does Hoyne suggest that the reduced rent or sales prices Hoyne can recover for two of the fourteen units would effectively deprive Hoyne of all economically viable uses of the land. (Def.'s Reply at 4.)

Plaintiffs do argue, however, that the ARO fits in the first category and "is tantamount to an invasion of property rights, *i.e.* a *per se* taking." (Pl.'s Resp. at 10.) Though no specific support for this theory is alleged in the complaint, Plaintiffs' memorandum contends that the ARO is the equivalent of a physical invasion of property in three ways. First, Plaintiffs assert that the ARO deprives a landowner of the right to fix the price at which he or she will sell property. (Pl.'s Resp. at 10.) Second, the ARO "operates on" an identifiable property interest. (Pl.'s Resp. at 10.) Third, the ARO requires a recorded encumbrance on the property. (Pl.'s Resp. at 11.)

Plaintiffs are correct that setting land prices is ordinarily the purview of the landowner. (Pl.'s Resp. at 10); *Old Dearborn Distrib. Co. v. Seagram-Distillers Corp.*, 299 U.S. 183, 192 (1936). That right has "certain exceptions," however. *Old Dearborn Distrib. Co.*, 299 U.S. at

8

192; *see also Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 626 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 2311 (2015) ("[T]he Supreme Court has recognized that Congress, for example, 'may set minimum wages, control prices . . .' all without implicating the Takings Clause.") (quoting *Connolly v. Pension Ben. Guaranty Corp.*, 475 U.S. 211, 223 (1986)). The Supreme Court has upheld regulations that set maximum rent prices and concluded that such regulations are not per se takings. *Yee*, 503 U.S. at 528–29. Further, while landowners generally have the right to set the prices at which to sell their land, Hoyne did not have the right to develop the multifamily project at all before the up-zoning that rendered the property subject to the ARO. Chicago Municipal Code 2-45-110. The ARO applied to Hoyne's property even before Hoyne applied for the permit. Hoyne could not give up the right to set the prices on these two units in exchange for a permit, when Hoyne never possessed that right in the first place.

Second, Plaintiffs contend that the ARO's rent/sale options "operate on" an identified property interest. (Pl.'s Resp. at 10.) Plaintiffs rely on *Koontz*, where the Supreme Court found unconstitutional a fee in lieu of an easement that "operated on" a particular property interest. (Pl.'s Resp. at 10); *Koontz*, 133 S.Ct. at 2598–99. *Koontz* found monetary obligations specifically tied to a piece of property to be unconstitutional, as opposed to fees not tied to a property interest. *See Koontz*, 133 S. Ct. at 2599 (distinguishing monetary demands where "the monetary obligation burdened petitioner's ownership of a specific parcel of land" from monetary demands that did not). Contrary to Plaintiffs' suggestion, however, *Koontz* does not invalidate all regulations, including non-monetary regulations, that "operate on" a particular piece of property. All property regulation, including permissible regulation, operates on specific property. Yet a zoning regulation that "operates on" some kinds of property interests, but not others, for example, does not amount to a physical invasion of the property. *See Yee*, 503 U.S. at 529–30 ("Traditional zoning regulations can transfer wealth from those whose activities are prohibited . . . . [B]ut the existence of the transfer in itself does not convert regulation into physical invasion.").

9

In fact, *Yee* is an example of a non-monetary regulation that is not a per se taking. In *Yee*, a regulation that set maximum rents for land rented to mobile home owners was not a per se taking because it did not require the landowners to rent their land to mobile homeowners, nor did it require them to continue doing so. *Yee*, 503 U.S. at 524, 527–28. The Court explained that "[w]hen a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge[.]" *Id.* at 529. The affordable rent option in the ARO effectively places maximum limits on the rent for two units for a finite amount of time. These limits are not a physical invasion of property any more than rental limits upheld in *Yee*. Similarly, the Tenth Circuit dismissed a challenge to a maximum sale price ordinance in *Alto Eldorado Partnership v. County of Santa Fe*, 634 F.3d 1170 (10th Cir. 2011). The ordinance at issue in that case, similar to the ARO, required landowners who chose to subdivide their land for resale to develop and sell a certain number of affordable housing units. *Id.* at 1172. The court found that the regulation was not a physical invasion of property, and instead "the regulatory action amounts to a restriction on how the developers may use their land should they choose to subdivide it or, in the alternative, the imposition of a fee." *Id.* at 1178.

The Court in *Yee* noted that it would look differently at an ordinance that compelled an owner to rent property indefinitely. *Yee*, 503 U.S. at 528. Plaintiffs argue that this is precisely what the ARO does, because it compels Hoyne to keep two units affordable for thirty years. (Pl.'s Resp. at 11.) For two reasons, the court is not moved by this attempt to distinguish *Yee*. First, thirty years is a lengthy period, but the ARO does carry a time limit; it does not apply in perpetuity. Chicago Municipal Code 2-45-110. Second, Hoyne is bound by the ARO in its property development plan, but nothing compelled Hoyne to embark on either the up-zoning or this particular development plan in the first place. Before the up-zoning, the land was zoned for other permissible uses. Hoyne was free to pursue those uses and could have avoided the requirement to make any affordable units available for either rent or sale. After the up-zoning, more development options were available. Thus, like *Yee*, Hoyne was not required to use its

land in a way that made itself subject to the ordinance. Contrary to Plaintiff's claims, the ARO does not compel Hoyne to rent its property, nor does it impose restrictions indefinitely.

Third, Plaintiffs argue that the ARO is analogous to a physical invasion of property because the City's "Affordable Rental Unit Covenant" ("Covenant") is recorded. (Pl.'s Resp. at 11–12.) The fact that the Covenant must be recorded, Plaintiffs contend, distinguishes it from other regulations because "zoning or other use ordinances restrict only current uses, and may be lifted by a vote of the governing legislative body." (Pl.'s Resp. at 11.) Yet, as the City points out, the ARO can be repealed by the City Council just as easily as a zoning ordinance or other restriction can (Def.'s Reply at 9), and although zoning ordinances may not require recording, they operate to bind future owners, just as the ARO does. In fact, a zoning ordinance restricts a property indefinitely unless government acts to change it, while the ARO covenant would expire after thirty years even without government action. Chicago Municipal Code 2-45-110.

Plaintiffs urge that the recording obligation is nevertheless a significant one. When an encumbrance is recorded, they assert, the public "obtains a right in the property" because a recorded encumbrance limiting future uses "essentially provides an easement which limits the owner[']s chosen use in favor of one which helps the public at large." (Pl.'s Resp. at 11–12.) Plaintiffs' only support for this is the definition of an easement as an interest in land owned by another person. (Pl.'s Resp. at 12.) Plaintiffs overstate the significance of recording. The act of recording itself does not create a public property right or a public easement.[3]

The ARO at issue in this case is not the only such restriction that has withstood challenge. In *California Building Industry Assn. v. City of San Jose*, 61 Cal. 4th 435, 351 P.3d 974 (2015), *cert. denied sub nom. California Building Industry Assn. v. City of San Jose, California*, 136 S. Ct. 928 (2016), the California Supreme Court held that a similar ordinance

---

[3] To record something is "to deposit it with an authority," not to create a property interest. *Record*, Black's Law Dictionary (10th ed. 2014); *see also Cal. Bldg. Indus. Assn.*, 61 Cal. 4th at 468, 351 P.3d at 996 ("Recordation simply assures that would-be purchasers of the affordable units are on notice regarding the restrictions relating to resale[.]").

11

requiring that developers sell fifteen percent of for-sale units at affordable prices was not a taking, but was a permissible restriction on use, akin to "land use limitations on the height of buildings, set-back requirements, density limits (lot size and number of units per lot), bedroom requirements and a variety of other use restrictions." *Cal. Bldg. Indus. Assn.*, 61 Cal. 4th at 461–62, 351 P.3d at 991. Plaintiffs attempt to distinguish this case on the grounds that California approves of price controls as a public policy, while the Illinois Rent Control Preemption Act specifically prohibits rent controls. (Pl.'s Resp. at 6–8.) The court is uncertain that Illinois policy influences the question whether the ordinance is unconstitutional; and in any event a requirement that Hoyne *sell* two units as affordable housing does not appear to run afoul of Illinois' prohibition on rent controls. But even if the court disregards the *California Building Industry* case, it concludes that Plaintiffs have not sufficiently alleged that the ARO's rent/sale options are not per se takings.

## 2. Regulatory Takings

As described above, Plaintiffs have not effectively alleged that the ARO deprives Hoyne of all economically beneficial use of its land, nor that the ARO imposes a permanent physical invasion of Hoyne's property. What is left of Hoyne's claim is an argument that the ARO falls into the third category of taking, a regulatory taking. A regulatory taking, as described in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), occurs when a regulation "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole[.]" *Penn Cent. Transp. Co.*, 438 U.S. at 123 (internal citations and quotation marks omitted). In *Penn Central*, the Court upheld a law that restricted the development of historic landmarks, even though it impinged on property values. *Id.* at 107, 131, 138. Regulatory takings are "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. Identifying them requires analysis of several factors, primarily (1) the character of the

government action, (2) the regulation's economic impact, and (3) its interference with distinct investment-backed expectations. *Id.* (citing *Penn Cent. Transp. Co.*, 438 U.S. at 124).

Although the complaint makes no mention of the regulatory taking doctrine, Plaintiffs have addressed it in their brief (Pl.'s Resp. 3–6), and the court does so as well. *See Craft v. Bd. of Trustees of Univ. of Illinois*, 516 F. Supp. 1317, 1323 (N.D. Ill. 1981) ("[T]he court is under a duty to examine the complaint to determine if the allegations provide for relief under any possible theory and should not dismiss the complaint merely because the plaintiff's allegations do not support the legal theory set forth in the complaint."). As discussed below, however, Plaintiffs' allegations do not establish a regulatory taking.

Plaintiffs' brief presents two arguments. First, Plaintiffs argue that because a regulatory taking analysis hinges on factual inquiries, it cannot be resolved at the motion to dismiss stage. (Pl.'s Resp. at 6.) Second, Plaintiffs point out that in *Yee* and *California Building Industry Assn.*, the courts did not address whether those ordinances were regulatory takings. (Pl.'s Resp. at 4–6); *Yee*, 503 U.S. at 530–31, 538; *Cal. Bldg. Indus. Assn.*, 61 Cal. 4th at 466, 351 P.3d at 995. Neither contention shores up Plaintiffs' regulatory taking claim. On a motion to dismiss, inferences are drawn in favor of the plaintiff, but Plaintiffs must still allege sufficient facts to support the inference that a regulatory taking is plausible. As discussed below, none of Plaintiffs' allegations do so.

### a. The Character of Government Action

First, as to the character of the government action, courts follow an analysis that overlaps with whether the regulation is a physical invasion of property. A government action "characterized as a physical invasion by government" is more likely to be a regulatory taking. *Penn Cent. Transp. Co.*, 438 U.S. at 124. On the other hand, if the regulation is more fairly characterized as "some public program adjusting the benefits and burdens of economic life to promote the common good[,]" this factor tilts against the regulation being a taking. *Id.*; *see also Connolly*, 475 U.S. at 225 (finding the factor not met when "the Government does not physically

invade or permanently appropriate [the] assets for its own use."). For reasons already explained, the court has determined that the ARO is not a physical invasion of the property and adheres to that analysis here, as well.

### b. The Economic Impact of the Regulation

Second, examining the economic impact of the regulation "requires us to compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 497 (1987). Here, the ARO rent/sale options require that two units must be rented or sold at affordable prices. (Compl. 10, 25.) The complaint includes no allegations regarding the impact of these reduced prices on the overall value of Hoyne's property, and therefore no basis for comparing the value of the property with and without the ARO.

The allegation that the ARO will have *some* impact on the property value is not sufficient to allege a regulatory taking. "Mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) (citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384 (1926); *Hadacheck v. Sebastian,* 239 U.S. 394, 405 (1915)). Many regulations are not takings even when they prohibit the landowner from making "the most beneficial use of the property"—that is, the most value-producing use. *Penn Cent. Transp. Co.*, 438 U.S. at 125.

Even if Plaintiffs had explicitly alleged that designating two units as affordable lowered the value of Hoyne's development, the complaint also indicates that there are other available uses for the property, consistent with the original zoning designation. Indeed, as the City points out, the ARO only applies because Hoyne "received rights to *increased* uses on [its] land." (Def.'s Reply at 4) (emphasis in original.) Taking Hoyne's allegations as true, it is implausible that Hoyne's property has decreased in value substantially, and any decrease may well be

counterbalanced by several other possible uses. Whatever diminution in value there is, Hoyne has not alleged it is substantial enough to be a taking.

### c. Interference with Reasonable Investment-Backed Expectations

The third primary *Penn Central* factor is the extent to which regulation interferes with distinct investment-backed expectations. Plaintiffs claim that Hoyne had no idea that the properties it had purchased would be treated as a single development until the City put a hold on the building permits, and that Hoyne expected that the development would be treated as separate projects to which the ARO does not apply. (Compl. ¶ 19.)

In order for this court to conclude that a regulation is a taking, Plaintiffs' investment-backed expectations must be objectively reasonable. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1074 (7th Cir. 2013); *see Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1090 (9th Cir. 2015) ("This principle "implies reasonable probability, like expecting rent to be paid[.]" (quoting *Guggenheim v. City of Goleta,* 638 F.3d 1111, 1120 (9th Cir. 2010)). This requirement means that Hoyne cannot simply rely on what it claims to have expected. That Hoyne did not know that the City would classify its development as one project and apply the ARO is not controlling if its expectation was not reasonable, as a reasonable investor will consider reasonably-likely regulatory actions. *See Rancho de Calistoga*, 800 F.3d at 1091 ("Just as [t]hose who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end, those who buy into a regulated field . . . cannot object when regulation is later imposed.") (first and second alterations in original) (internal citations and quotation marks omitted). Hoyne alleges that it did not expect that the ARO would apply to its property, but it does not seem likely that a developer would not have considered the possibility that two properties—not yet subdivided into three tax parcels, purchased at the same time, for which it applied for zoning changes and building permits simultaneously—would be classified by the City as a single project.

15

In short, Hoyne's expectations do not appear to be reasonable ones. As the City notes in the context of addressing one of Hoyne's state law claims, the City retains significant discretion to interpret the ARO, so Hoyne's expectations were reasonable only if the City's interpretation was clearly erroneous. (Def.'s Reply at 12–14.) A Ninth Circuit case, *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083 (9th Cir. 2015), also illustrates the reasonableness requirement. In *Rancho de Calistoga*, the city where plaintiff's property was located enacted a rent-control ordinance. *Rancho de Calistoga*, 800 F.3d at 1091. The court found that "those who buy into a regulated field . . . cannot object when regulation is later imposed." *Id.* Hoyne can be expected to know that the City might apply an existing regulation to its development, the City argues. (Def.'s Reply at 5–6.) And Hoyne cannot have a reasonable expectation to a market price for all its units when it gave up any such rights in return for the benefits of the up-zoning. (Def.'s Reply at 6–7.)

As noted, Hoyne's complaint makes no mention of its regulatory taking theory, nor does it include any allegations specifically explaining why its expectations were reasonable. Hoyne does argue, as part of its state law challenge to the City's application of the ARO, that the City's classification of the development as one project was incorrect. (Pl.'s Resp. at 13–14.) For a court to overturn the City's classification of the development as one project, however, the City's interpretation of the ARO must be clearly erroneous. *DTCT, Inc. v. City of Chicago Dep't of Revenue*, 407 Ill. App. 3d 945, 952, 944 N.E.2d 449, 455 (1st Dist. 2011) ("We give deference to the Department's interpretation of an ordinance it administers and will follow that interpretation unless it is clearly erroneous."). Plaintiffs' arguments do not overcome this high hurdle of deference. Indeed, Hoyne's own allegations appear to confirm that the City's classification of its properties as a single project makes sense. The ARO explicitly allows multiple buildings to be classified as one project in circumstances such as those that Hoyne alleges: (1) there were three separate buildings (Compl. ¶ 14), (2) the buildings were located on two contiguous properties (Compl. ¶ 11), (3) Hoyne acquired them at the same time (Compl.

¶ 11), and (4) Hoyne apparently kept them as part of a combined package when applying to change the zoning and for the permits. (Compl. ¶ 15, 17; Ex. 3 to Def.'s Mem. at 44457.)[4]

Even if the buildings were separate, Hoyne prepared for their development simultaneously, and they were not originally separate lots. Defining them as one project is not clearly erroneous on the allegations alone. Plaintiffs' only additional argument is that the buildings did not share any common elements, and thus did not satisfy one of the possible ways for multiple buildings to be grouped into one project. (Pl.'s Resp. at 13–14.) The ARO does not define "common elements," but the City argues that the simultaneous purchase and development schedule, as well as the fact that they were acquired at the same time from the same seller, constitute "common elements" for purposes of the ordinance. (Def.'s Mem. at 14–15.) Plaintiffs propose other definitions of the term "common elements" (Pl.'s Resp. at 13–14), but the existence of more plausible alternate definitions of that term does not establish that the City's interpretation is clear error. Notably, Plaintiffs' complaint itself refers to all three buildings as "the property." (Compl. ¶ 18; Def.'s Reply at 13); *see Tim Thompson, Inc. v. Vill. of Hinsdale*, 247 Ill. App. 3d 863, 888, 617 N.E.2d 1227, 1245 (2d Dist. 1993) ("[W]e choose to view [the plaintiff's] property not as three distinct segments, as [the plaintiff] would have us do[,]" but instead viewing the lots as one parcel, "which is supported by the well-pleaded fact[s] in [the plaintiff's] complaint[.]").

Just as a property owner must consider the possibility of future regulations, or a taxpayer must consider the possibility of property tax changes, so Hoyne cannot rely only what it actually anticipated when the City has the discretion it exercised here. Hoyne's assumption that the City would not characterize its development as one project is not, in this court's view, any more reasonable than that of the plaintiff in *Rancho de Calistoga,* who argued that because it owned

---

[4] The ordinance defines "Residential housing project" or "project" as "one or more buildings that collectively contain ten or more housing units on one or more tax parcels or lots marketed as a single or unified project or sharing common elements, or comprising a part of a planned development . . . ." Chicago Municipal Code 2-45-110.

the property before a rent control ordinance was passed, "it had an investment-backed expectation to be free from rent control." *Rancho de Calistoga*, 800 F.3d at 1091. The Ninth Circuit ruled that the plaintiff had no such reasonable expectation: "[the plaintiff's] argument is tantamount to saying that a homeowner can reasonably expect that the tax assessment or rate of taxation on her home will not increase from the time of purchase." *Id.*; *see also Goodpaster*, 736 F.3d at 1074 (explaining that businesses in regulated areas should not be surprised when regulations change). In the case before this court, the City did not even adopt a new regulation, but instead applied an existing regulation to Hoyne.

Finally, as the City observes, Hoyne had no reasonable expectation of developing fourteen market-rate units because Hoyne never possessed that right in the first place. (Def.'s Reply at 6.) Hoyne purchased the property when it was zoned for commercial use. As soon as Hoyne requested and received the up-zoning, it had the right to develop twelve market-rate units and two affordable units. (Def.'s Reply at 6.) In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), a statute authorized the disclosure of proprietary data whenever a company registered a new pesticide for distribution in the market. *Monsanto*, 467 U.S. at 1006–07. The Supreme Court held that registration was voluntary, "in exchange for the economic advantages of a registration[.]" *Id.* at 1007. As a result, the disclosure of the proprietary data was not a taking; it was a voluntary exchange, in return for a benefit. *Id.* The Court concluded that "Monsanto could not have had a reasonable, investment-backed expectation that EPA would keep the data confidential." *Id.* at 1006. Here, similarly, when Hoyne successfully sought to up-zone the property for greater commercial return, he received a benefit, and in exchange gave up the right to the full market value of two units. As in *Monsanto*, Hoyne therefore could have no reasonable expectation to be able to develop fourteen market-price units when it applied for the building permits. (Def.'s Reply at 6.)

Attempting to distinguish *Monsanto*, Plaintiffs cite to *Nollan*, where the Supreme Court observed that "the right to build on one's own property—even though its exercise can be

18

subjected to legitimate permitting requirements—cannot remotely be described as a 'governmental benefit.'" *Nollan*, 483 U.S. at 833 n.2. But, as the City points out, in *Nollan*, the plaintiffs already possessed the right to build on their land when the California Coastal Commission imposed a requirement that the plaintiffs grant an easement. (Def.'s Reply at 6); *Nollan*, 483 U.S. at 827–28, 833 n.2. Here, Hoyne did not have a pre-existing right to build the proposed development, and obtain market rates for each of those units, before the up-zoning. Unlike the plaintiffs in *Nollan*, therefore, Hoyne did not give up a pre-existing right.

Determining whether a restriction constitutes a regulatory taking ordinarily requires a fact-specific inquiry. In this case, however, Plaintiffs' allegations do not sufficiently allege any of the factors needed to establish that the ARO was a regulatory taking of Hoyne's property. Thus, Hoyne's as-applied challenge to the ARO is dismissed without prejudice.

### C. Plaintiffs' Facial Challenge

Turning to Plaintiffs' facial challenge to the ARO, the City argues that the facial challenge fails because Plaintiffs cannot show that there is no set of circumstances under which the ARO would be valid. (Def.'s Mem. at 12), *citing United States v. Salerno*, 481 U.S. 739, 745 (1987). A law is unconstitutional if its "mere enactment" is a taking. *Hodel v. Virginia Surface Min. & Reclamation Assn., Inc.*, 452 U.S. 264, 295 (1981) (internal citations and quotation marks omitted).

The court has concluded that the ARO passes constitutional muster as applied to Hoyne. As to the ARO's "mere enactment," Plaintiffs offer no additional basis for concluding that designation of ten percent of housing units as affordable, in exchange for a zoning change, constitutes the taking of a right that requires compensation. The complaint does imply that the ARO "conditions the approval of a land-use permit on the owner's relinquishment of a portion of his property" (Compl. ¶ 33), but this is a conclusory allegation of an unspecified property right. Plaintiffs' allegations simply assume that the ARO triggers the *Nollan/Dolan* analysis, which does not suffice. Plaintiffs must allege that designating ten percent of units as affordable

19

violates a distinct property right and requires just compensation, before examining the *Nollan/Dolan* analysis. Plaintiffs' only such arguments are those outlined above, that relate to Hoyne. The facial challenge is dismissed without prejudice.

## III. State Law Claims

Plaintiffs' remaining claims are state law claims: the facial and as-applied challenges to the ARO under the Illinois Constitution, and the claim that the City's application of the ARO to Hoyne exceeded its authority. As to this second state law claim, the court's analysis of Hoyne's reasonable expectations necessarily involved examining the City's characterization of Hoyne's development as one project. This claim also pertains to the City's policy of rounding up to calculate the number of required affordable units, which is not implicated in the federal claims. (Pl.'s Resp. at 14–15). Until and unless Plaintiffs succeed in stating a federal claim, the court declines to exercise supplemental jurisdiction over their state law claims, and dismisses them without prejudice. 28 U.S.C. 1367(c)(3).

## **CONCLUSION**

The City's motion to dismiss [16] is granted. Plaintiffs have leave to file an amended complaint within 21 days.

ENTER:

Dated: September 30, 2016

_____
REBECCA R. PALLMEYER
United States District Judge